HUGHES AIRCRAFT COMPANY,
Plaintiff,

v.

NATIONAL SEMICONDUCTOR
CORPORATION,
Defendant.

NATIONAL SEMICONDUCTOR CORPORATION and Fairchild Semiconductor Corporation, Counterclaimants,

v.

HUGHES AIRCRAFT COMPANY and General Motors Corporation, Counterdefendants.

Civ. No. 93–20569 SW.

United States District Court,
N.D. California.

June 6, 1994.

See also, 850 F.Supp. 828.

Philip C. Swain, Kirkland & Ellis, Los Angeles, CA, William A. Streff, Jr., Kirkland & Ellis, Chicago, IL, Jay I. Alexander, Kirklan & Ellis, Washington, DC, for plaintiff.

William J. Goines, Thomas P. Murphy, Berliner, Cohen, San Jose, CA, Timothy N. Trop, Arnold, White & Durkee, Houston, TX, Irving S. Rappaport, Menlo Park, CA, for defendant.

## ORDER DENYING NSC'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING HUGHES' CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING GENERAL MOTORS' MOTION FOR SUMMARY JUDGMENT; DENYING NSC AND FAIRCHILD'S MOTION FOR LEAVE TO FILE AN AMENDED COUNTER-CLAIM

SPENCER WILLIAMS, Senior District Judge.

## BACKGROUND

Plaintiff Hughes Aircraft Company (hereafter "Hughes") is the assignee of the following United States patents, each of which is directed to technology used in the semiconductor industry: (1) No. 3,472,712, entitled "Field–Effect Device with Insulated Gate," originally issued on October 14, 1969; (2) No. 3,507,709, entitled "Method of Irradiating Dielectric–Coated Semiconductor Bodies with Low Energy Electrons," originally issued on April 21, 1970; and (3) No. 3,615,934, entitled "Insulated Gate Field Effect Device Having Source and Drain Regions Formed in Part by Ion Implantation and Method of Making Same," originally issued on October

26, 1971. These patents are collectively referred to as "the Bower patents."

In 1980, Hughes began contacting companies which it believed were infringing the Bower patents. Defendant National Semiconductor Corporation (hereafter "NSC") was one of the companies Hughes contacted. In 1988 Hughes entered into a tolling agreement with NSC which provided in pertinent part that

> The statutory period of recovery under 35 U.S.C. § 286 [1] is hereby tolled as of September 1, 1988 with respect to [the Bower patents] such that in any subsequent lawsuit by HUGHES AIRCRAFT COMPANY against NATIONAL SEMICONDUCTOR CORPORATION alleging infringement of [the Bower patents], NATIONAL SEMICONDUCTOR CORPORATION shall not assert 35 U.S.C. § 286 as a defense for any infringement of said patents occurring subsequent to September 1, 1982.

On May 29, 1992, NSC and Hughes executed a tolling agreement extension, which provided in pertinent part that

> HUGHES and NATIONAL desire to promptly enter into and pursue negotiations toward settlement of HUGHES' claim against NATIONAL for infringement of the [Bower] patents without the need for HUGHES to file an infringement lawsuit against NATIONAL and for NATIONAL to defend such suit[.]

> \* \* \* \* \* \*

> WHEREAS [in the 1988 tolling agreement], NATIONAL agreed [that it] would not assert 35 U.S.C. 286 as a defense to damages for any infringement of said patents occurring subsequent to September 1, 1982.... The tolling period under 35 U.S.C. 286 in the aforesaid Tolling Agreement between NATIONAL and HUGHES is hereby extended until December 1, 1992 with respect to damages under 35 U.S.C. 286 such that the tolled period runs from September 1, 1982 to December 1, 1986.

On December 2, 1992, Hughes filed the above-captioned patent infringement suit against NSC in the Northern District of Illinois. Also on December 2, 1992, NSC filed a Complaint for Declaratory Relief and Breach of Contract in Santa Clara County Superior Court, alleging among other things that the tolling agreements were unenforceable. Santa Clara County Sup.Ct. No. 726934. According to its memorandum of points and authorities in support of its Motion for Summary Adjudication, NSC's theory was that enforcement of the tolling agreements would (1) extend the life of the Bower patents and Hughes' right to sue for infringement of them beyond that which was allowed under federal law; and (2) give Hughes an almost limitless right of recovery, since neither the tolling agreement nor the tolling agreement extension placed any limitation on how long Hughes could delay in bringing suit. The Superior Court denied NSC's Motion for Summary Adjudication and subsequently entered summary adjudication in favor of Hughes. *See* October 28, 1993 Notice of Ruling; April 13, 1994 Notice of Ruling.

On March 4, 1993, Hughes' federal action was transferred to the Northern District of California pursuant to 28 U.S.C. § 1404(a). On May 7, 1993, NSC and its subsidiary, Fairchild Semiconductor Corporation (hereafter "Fairchild"), filed a Counterclaim alleging that Hughes and its parent company, General Motors Corporation, had infringed and induced the infringement of three United States patents: (1) No. 3,901,735, entitled "Integrated Circuit Device and Method Utilizing Ion Implanted and Up Diffusion for Isolated Region," issued August 26, 1975; (2) No. 4,325,984, entitled "Plasma Passivation Technique for the Prevention of Post–Etch Corrosion of Plasma–Etched Aluminum Fields," issued on April 20, 1982; and (3) No. 4,599,634, entitled "Stress Insensitive Integrated Circuit," issued on July 8, 1986.

On December 28, 1993, NSC filed a Motion to Dismiss Hughes' claim for infringement of the '712 patent pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure (lack of

---

1. 35 U.S.C. § 286 provides in pertinent part: Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement.

subject matter jurisdiction). NSC's theory was that (1) the six-year statute of limitations governing Hughes' claim for damages, 35 U.S.C. § 286, is not a statute of limitations in the usual sense, but rather a limitation on a federally created right; (2) as such, it defines the federal courts' jurisdiction under the Patent Act and cannot be altered or extended by tolling agreements; and, therefore, (3) this Court lacked subject matter jurisdiction over Hughes' claim for infringement of the '712 patent, since it expired more than six years before Hughes filed this action, and hence could not have been infringed during the jurisdictional period.[2] The Court denied NSC's Motion to Dismiss on March 24, 1994. *Hughes Aircraft Company v. National Semiconductor Corp.*, 850 F.Supp. 828 (N.D.Cal. 1994).

Also on December 28, 1993, NSC moved for partial summary judgment regarding its alleged acts of infringement occurring more than six years before Hughes filed its Complaint. In this Motion, NSC argued that even if the tolling agreements were fully enforceable as written, they were nevertheless irrelevant, since Hughes filed its Complaint one day after they expired. Hughes filed a Cross–Motion for Partial Summary Judgment on the issue of whether, based on the tolling agreements, it could recover damages for infringement occurring as early as September 1, 1982. On March 24, 1994, the Court ordered supplemental briefing on these Motions and scheduled a supplemental hearing for May 25, 1994. *Hughes Aircraft Company v. National Semiconductor Corp.*, 850 F.Supp. 828 (N.D.Cal.1994).

On April 20, 1994, Counterdefendant General Motors filed a Motion for Summary Judgment on NSC and Fairchild's Counterclaim for infringement of the '735, '984 and '634 patents. On April 28, 1994, NSC and Fairchild filed a Motion for Leave to File an Amended Counterclaim which would add Delco Electronics Corporation, a subsidiary of General Motors, as a Counterdefendant. The Court also heard oral argument regarding these Motions on May 25, 1994.

For the reasons stated below, the Court (1) DENIES NSC's Motion for Partial Sum-

mary Judgment; (2) GRANTS Hughes' Cross–Motion for Partial Summary Judgment; (3) GRANTS General Motors' Motion for Summary Judgment; and (4) DENIES NSC and Fairchild's Motion for Leave to File an Amended Counterclaim.

## DISCUSSION

A. *NSC's Motion for Partial Summary Judgment Re: Infringement Occurring More Than Six Years Before the Filing of The Complaint and Hughes' Cross–Motion for Partial Summary Judgment*

### 1. *Legal Standard*

A party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion. . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To sustain this burden, the moving party must demonstrate that no genuine issue of material fact exists for trial. *Id.*, 477 U.S. at 322, 106 S.Ct. at 2552. However, the moving party is not required to *negate* those portions of the nonmoving party's claim on which the nonmoving party bears the burden of proof. *Id.*

Once the moving party demonstrates that there is no genuine issue of material fact, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id.*, 477 U.S. at 324, 106 S.Ct. at 2552. To sustain this burden, the nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*, 477 U.S. at 322, 106 S.Ct. at 2552.

2. *The Merits of NSC's Motion for Partial Summary Judgment and Hughes' Cross–Motion for Partial Summary Judgment*

NSC contends that it is entitled to summary judgment on Hughes' allegation that it infringed the '712 patent because (1) the tolling agreements provided only that the statutory damage recovery period would be tolled from September 1, 1982 to December

---

**2.** Hughes admits that the '712 patent expired on     October 14, 1986.

1, 1992; (2) because Hughes did not file its Complaint until December 2, 1992, it is not entitled to take advantage of the extended damage recovery period provided under the tolling agreements; (3) this case is therefore governed solely by 35 U.S.C. § 286, which provides that a plaintiff may recover only for infringement occurring within the six years preceding the filing of the Complaint; and (4) because the '712 patent expired more than six years before the Complaint was filed, it could not have been infringed during the statutory period. Hughes has filed a Cross–Motion for Partial Summary Judgement on the grounds that, based on the terms of the tolling agreements, it is entitled to recover damages for infringement of the '712 patent occurring between September 1, 1982 and October 14, 1986, the date the '712 patent expired.

■ NSC's argument has at least three serious flaws. First, it is based upon a fundamental misunderstanding of 35 U.S.C. § 286. When a potential defendant signs an agreement to toll an ordinary statute of limitations, he is agreeing to allow the potential plaintiff to file his Complaint on or before some specified date after the statutory time limit has elapsed. If the potential plaintiff fails to file his Complaint on or before this date, he usually loses the benefit of the tolling agreement and his action is barred by the statute of limitations. However, 35 U.S.C. § 286 places no time limit on the filing of the Complaint. Rather, it provides that a plaintiff may recover damages only for those acts of infringement which occurred within the six years preceding the filing of the complaint. *Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co., Ltd.,* 754 F.2d 345, 348 (Fed. Cir.1985). Given the way that 35 U.S.C. § 286 functions, agreements to toll its six-year damage recovery period are properly construed as allowing the potential plaintiff to recover damages for acts of infringement occurring during both (1) the six-year statutory period; and (2) a supplemental damage recovery period specified in the agreement. Using this analysis, the 1988 tolling agreement between NSC and Hughes is properly construed as allowing Hughes to recover (1) damages for all acts of infringement occurring within the six years preceding the filing of the Complaint, December 2, 1986 to December 2, 1992; plus (2) damages for all acts of infringement occurring during the supplementary damage recovery period to which the parties agreed, September 1, 1982 to September 1, 1988. Because the combined damage recovery period provided under the 1988 tolling agreement encompasses the entire period for which Hughes seeks to recover damages for infringement of the '712 patent, September 1, 1982 to October 14, 1986, it is entitled to prevail in its Cross–Motion for Summary Judgment by virtue of this agreement alone, and the Court need not consider the 1992 tolling agreement extension.

■ Second, NSC's construction of the 1988 tolling agreement would be inconsistent with the mutual intent of the parties at the time it was executed. *See* Cal.Civ.Code § 1636; *AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 821–22, 274 Cal.Rptr. 820, 831, 799 P.2d 1253, 1264 (1990) (mutual intent of the parties at the time a contract was executed governs subsequent judicial efforts at interpretation). On the date in which the 1988 tolling agreement was signed, Hughes had two choices. First, it could have filed a Complaint alleging that NSC had infringed the Bower patents, thereby preserving its right to recover damages for infringement occurring during the preceding six years. However, this would have cost a great deal of money and consumed a significant amount of both the parties' and the district court's time. Second, Hughes could execute an agreement with NSC allowing Hughes to recover damages for infringement during that six-year period without filing a federal law suit. Under the second approach, (1) Hughes would not lose its right to recover damages; (2) NSC would avoid a lawsuit, at least for the time being; (3) both parties could pursue settlement and possibly avoid the need for litigation; and (4) the federal courts would not be required to step in and resolve the parties' differences, at least for the time being, and perhaps indefinitely. The evidence reveals that both parties understood that Hughes was following this second approach when it proposed the 1988 tolling agreement.

The third and final flaw in NSC's argument is perhaps the most disturbing. In its memorandum of points and authorities in support of its Motion for Summary Adjudication in Santa Clara County Superior Court, NSC argued that (1) neither the original tolling agreement nor the tolling agreement extension "placed [any] limitation on how long Hughes could delay bringing suit," Points & Auths. at 2:24–25; and (2) Hughes "could indefinitely delay bringing suit" against NSC, Points & Auths. at 3:1–2. Obviously, this directly contradicts the arguments which NSC has made in connection with its Motion for Partial Summary Judgment before this Court. The Court wonders whether counsel for NSC was unable to understand this inconsistency or whether counsel believed that the Court would not be able to do so. If it was the former, the Court urges counsel for NSC to be more diligent and studious in the future. If it was the latter, counsel for NSC is advised that neither they nor their client will benefit from such tactics.

### 3. *Conclusion*

For the reasons stated above, the Court (1) DENIES NSC's Motion for Partial Summary Judgment regarding its alleged acts of infringement occurring more than six years before the filing of the Complaint; and (2) GRANTS Hughes' Cross–Motion for Partial Summary Judgment on the issue of whether it may recover damages for acts of infringement occurring after September 1, 1982.

**B.** *General Motors' Motion for Summary Judgment on NSC and Fairchild's Counterclaim*

In their Counterclaim, NSC and Fairchild allege that General Motors, Hughes' parent company, has (1) directly infringed the '735,-

**3.** 35 U.S.C. § 271(a) provides as follows:
Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

**4.** 35 U.S.C. § 271(g) provides in pertinent part:
Whoever without authority imports into the United States or sells or uses within the United States a product which is made by a process patented in the United States shall be liable as

'984 and '634 patents; and (2) induced infringement of these patents. General Motors now moves for summary judgment.

1. *NSC and Fairchild's Claim That General Motors Directly Infringed the '735 and '984 Process Patents*

■ General Motors contends that it could not, as a matter of law, directly infringe the '735 and '984 process patents within the meaning of 35 U.S.C. § 271(a),[3] since (1) it does not manufacture semiconductors; (2) the only way to directly infringe a process patent under 35 U.S.C. § 271(a) is to actually perform the process taught in the patent; (3) merely selling products manufactured using an infringing process does not constitute direct infringement under 35 U.S.C. § 271(a). The Court agrees. It is well established that an individual who merely sells a product manufactured using an infringing process does not directly infringe the process patent within the meaning of 35 U.S.C. § 271(a). *See Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*, 970 F.2d 834, 836 (Fed.Cir.1992); *Koratron Co. v. Lion Uniform, Inc.*, 449 F.2d 337, 338 (9th Cir.1971). Accordingly, General Motors is entitled to summary judgment on NSC and Fairchild's claim that it has directly infringed the process patents under this statute.

However, under certain circumstances, an individual who sells a product manufactured using an infringing process may directly infringe under 35 U.S.C. § 271(g).[4] General Motors contends that it has not infringed the process patents under this provision because (1) the allegedly infringing semiconductors are merely a "trivial and nonessential component" of its automobiles, *see* 35 U.S.C. § 271(g)(2); and (2) even if they are not "trivial and nonessential," it is not a proper party under 35 U.S.C. § 271(g).

an infringer, if the importation, sale or use of the product occurs during the term of such process patent.... A product which is made by a patented process will, for the purposes of this title, not be considered to be so made after——
(1) it is materially changed by subsequent processes; or
(2) it becomes a trivial and nonessential component of another product.

The crux of General Motors's "trivial and nonessential" argument is that (1) the allegedly infringing semiconductors are only a small part of its automobiles; and (2) the manufacturing of the allegedly infringing semiconductors is far removed in the chain of production from the assembly its automobiles. Specifically, General Motors asserts that (1) many of the allegedly infringing semiconductors are manufactured by IC Delco, a subsidiary of Delco Electronics and then transferred to the Audio Business Unit of Delco Electronics for incorporation into car radios; (2) Delco Electronics then sells the radios to General Motors; and (3) General Motors then installs the radios into its automobiles and sells them to consumers. Other semiconductors manufactured by IC Delco are incorporated into hybrid products, which often contain several chips. The hybrid products are then incorporated into larger electronic components, such as ignition control modules. These modules are then sold to General Motors, incorporated into automobile ignition systems, and the final product, a finished automobile, is sold to the public. Still others are incorporated into antitheft and airbag systems.

■ Although General Motors' evidence makes it clear that the allegedly infringing semiconductors are only a small part of their automobiles, it does not support a finding that they are trivial and nonessential as a matter of law, particularly in light of the legislative history of 35 U.S.C. § 271(g). 35 U.S.C. § 271(g) was enacted as part of the Process Patent Amendments Act of 1988 (hereafter the "PPAA"), 102 Stat. 1563. The Report of the Senate Judiciary Committee gives a series of examples designed to guide the courts in defining the words "trivial and nonessential." S.Rep. No. 83, 100th Cong., 1st Sess., 49–52 (1987). In one such example, the Committee indicates that if a shock absorber is manufactured using an infringing process and subsequently incorporated into an automobile, the automobile manufacturer would not be shielded from the effect of 35 U.S.C. § 271(g) by the "trivial and nonessential" exception. Based on the evidence which General Motors has presented, there are only two differences between the case at bar and the one described by the Committee: (1)

the semiconductors General Motors uses pass through one or more subsidiaries before they are finally incorporated into its finished automobiles; and (2) the semiconductors are not directly incorporated into General Motors' automobiles, but are merely parts of larger systems or modules. These distinctions are not so significant as to justify summary judgment.

General Motors' second argument raises a more fundamental and troubling problem: whether the imposition of liability on General Motors under the PPAA given the particular facts of this case would be consistent with the legislative history and purpose of that statute. According to the Report of the Senate Judiciary Committee, the primary purpose of the PPAA was "to modernize our patent laws" by providing "patent protection against the importation, and subsequent use or sale, of products made abroad . . . using a process patented in the United States." S.Rep. No. 83, 100th Cong., 1st Sess., 29–30 (1987). The Committee later reiterates that the PPAA was intended to "protect against the entry into the U.S. marketplace of goods made abroad without authorization from [an] inventor who has a process patent in this country." *Id.* at 30. Finally, and most importantly to the case at bar, the Committee states that

> The primary target of the U.S. process patent holder will naturally be the manufacturer, who is practicing the process and importing [sic] the resulting goods into the United States. If that manufacturer is subject to the jurisdiction of the U.S. courts then it would be the preferred defendant because of its direct knowledge of the process. Since the manufacturer may not be subject to jurisdiction, [the PPAA] also allows the patentholder to sue the persons receiving the goods in this country in the belief that they may be in the best position, apart from the manufacturer, to determine how the goods were made.

*Id.* at 39.

■ Based on its legislative history, it appears that the PPAA was designed to provide a remedy within the United States for United States process patent holders whose

processes were being used in other countries to manufacture goods for importation into the United States. It does not appear to have been designed to provide a basis for holding a domestic, downstream seller of goods, such as General Motors, liable for infringement merely because it has incorporated an allegedly infringing good produced by a domestic, upstream manufacturer, such as Delco Electronics, into its finished product. Accordingly, General Motors is entitled to summary judgment on NSC and Fairchild's claim that it directly infringed the process patents under 35 U.S.C. § 271(g).

### 2. NSC and Fairchild's Claim that General Motors Directly Infringed the '634 Product Patent

■ Under 35 U.S.C. § 271(a), "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." General Motors admits that it purchases semiconductors from its subsidiary, Delco Electronics, and incorporates them into its automobiles. However, General Motors contends that it has not directly infringed the '634 patent by doing so, since the semiconductors which it purchases do not infringe the '634 patent.

The '634 patent is directed to an integrated circuit having certain individual circuit elements arranged in such a manner as to reduce the effects of mechanical stress on the operation of the circuit as a whole. Such mechanical stress occurs when the integrated circuit's silicon substrate is mounted in a protective packaging material, such as a ceramic or metal "lead frame," and may cause certain matched elements of the integrated circuit to fail to operate properly. The '634 patent teaches that (1) when a semiconductor substrate is mounted on a lead frame, the resulting mechanical stress will be symmetrical about an axis, that is, the amount of stress experienced at a particular location on one side of the axis will be approximately equal to the amount of stress experienced at a corresponding location on the opposite side of the axis; and (2) the adverse effects of this stress can be reduced by locating pairs of circuit elements about the axis of symmetry.

General Motors contends that none of Delco's semiconductors use the mechanical stress reduction techniques taught by the '634 patent. Rather, General Motors has presented evidence that Delco compensates for mechanical stress by either (1) locating matched circuit elements side-by-side and as close as possible to each other on the semiconductor substrate, Kearney Depo., pp. 62–63, Alexander Decl., Exh. O; and (2) "cross-coupling" the circuit elements, Kearney Depo., pp. 52–58 and Exh. 14, Alexander Decl., Exh. O.

Although NSC and Fairchild dispute the fine points of General Motors' interpretation of the '634 patent, they have not produced even a shard of evidence that any of Delco's semiconductors infringe it. Accordingly, General Motors is entitled to summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (summary judgment appropriate where nonmoving party fails to designate "specific facts showing that there is a genuine issue for trial").

### 3. NSC and Fairchild's Claim That General Motors Induced Infringement of the '735, '984 and '634 Patents

■ Whoever actively induces infringement of a patent shall be liable as an infringer. 35 U.S.C. § 271(b). In order to prevail in an action for inducement, a plaintiff must show that the defendant actually knew of the patent and intended to cause the acts which constituted the infringement. Hewlett–Packard Co. v. Bausch & Lomb Inc., 909 F.2d 1464, 1469 (Fed.Cir.1990); Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660, 668 (Fed.Cir.1988); Dynamis, Inc. v. Leepoxy Plastics, Inc., 831 F.Supp. 651, 656–57 (N.D.Ind.1993). The intent requirement may be satisfied by either direct or circumstantial evidence. Water Technologies, 850 F.2d at 668.

In support of its Motion for Summary Judgment on NSC and Fairchild's claim that it induced the infringement of the '735 and '984 process patents, General Motors has produced evidence showing that (1) it exercised no control over the manufacturing processes used by its semiconductor suppliers,

Andersson Decl., ¶ 5; (2) it did not care how the components were produced as long as the suppliers' products met its specifications, and therefore it had no reason to direct them to infringe the '984 and '735 patents, Andersson Decl., ¶ 6; (3) it did not learn that NSC believed that the '735 and '984 were being infringed until NSC indicated this belief in a letter it sent to Hughes, General Motors' subsidiary, on October 13, 1992, Alexander Decl., Exh. D; (4) when NSC contacted General Motors directly in November 1992, it did not mention either patent, Alexander Decl., Exh. E.

▇ In an effort to sustain their burden of designating "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), NSC and Fairchild assert that Delco Electronics and Hughes have infringed the '735 and '984 patents, and have presented evidence that (1) until the creation of General Motors Hughes Electronics, a wholly-owned subsidiary of General Motors, Delco operated as a division of General Motors; (2) upon the creation of General Motors Hughes Electronics, which was concurrent with the acquisition of Hughes by General Motors, Delco Electronics became a wholly-owned subsidiary of General Motors Hughes Electronics; (3) as of 1991, 92.8% of General Motors Hughes Electronics' revenues in its automotive electronics segment were attributable to sales to General Motors and its consolidated subsidiaries; (4) a majority of the directors of General Motors Hughes Electronics are also executive officers of General Motors; and (5) General Motors has stated in its prospectus that "as the sole shareholder of General Motors Hughes Electronics, General Motors controls the General Motors Hughes Electronics board of directors and, . . . is able to cause General Motors Hughes Electronics to

. . . enter into such transactions with General Motors as General Motors deems desirable and appropriate."

NSC and Fairchild's evidence does nothing but prove the obvious proposition that General Motors, as the parent company of Delco Electronics and Hughes, has extensive involvement and control over their activities. However, none of the evidence which NSC and Fairchild have presented (1) gives any direct indication that General Motors had any knowledge of the '735 and '984 patents; (2) knew whether its subsidiaries or suppliers used processes which were in any way similar to those taught by these patents; (3) intended for its subsidiaries to infringe the '735 and '984 patents; or (4) had any interest in how the products purchased from its suppliers were manufactured. Accordingly, General Motors is entitled to summary judgment on NSC and Fairchild's claim that it induced the infringement of the '735 and '984 patents. Furthermore, because NSC and Fairchild have failed to raise a genuine issue of material fact regarding whether Delco Electronics infringed the '634 patent, *see* Section B.2 of this Order, their argument that General Motors induced Delco Electronics to do so must also fail.

### 4. *Conclusion*

For the reasons stated above, General Motors' Motion for Summary Judgment is GRANTED.[5]

### C. *NSC and Fairchild's Motion for Leave to File an Amended Counterclaim*

#### 1. *Legal Standard Governing Motions for Leave to File an Amended Pleading*

▇ Where, as here, a party's opponent has filed a responsive pleading, the party may amend its pleadings only with leave of

---

**5.** NSC and Fairchild contend that the Court should continue the hearing on General Motors' Motion for Summary Judgment on the ground that it has not had an adequate opportunity to conduct discovery. *See* Fed.R.Civ.P. 56(f). The Court rejects this contention on the grounds that (1) NSC and Fairchild have had an adequate opportunity to discover the facts relevant to General Motors' Motion; and (2) NSC and Fairchild's contention is based merely on "vague

assertions that additional discovery would produce needed, but unspecified, facts." *United States v. $5,644,540 in U.S. Currency*, 799 F.2d 1357, 1363 (9th Cir.1986); *see also Church of Scientology v. I.R.S.*, 991 F.2d 560, 562 (9th Cir.1993) (Rule 56(f) application should be denied "where the evidence sought [is] almost certainly non-existent or [is] the object of pure speculation").

court or by written consent of his opponent. Fed.R.Civ.P. 15(a). Although leave to be amend is to "be freely given," *id.*, the decision whether to grant leave is entirely within the sound discretion of the district court. *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir.1990); Wright, Miller & Kane, *Federal Practice and Procedure*, Civil 2d, § 1484, pp. 594–96 and n. 5 (citing cases). In deciding whether to grant leave, it is proper for the district court to consider (1) whether amendment will prejudice the amending party's adversary; (2) whether the amending party has delayed unnecessarily in requesting leave; (3) whether the allegations to be added would be futile or frivolous; (4) whether the addition of the new claims would "greatly change the nature of the litigation;" and (5) whether the party seeking leave has acted in bad faith. *Schlacter–Jones v. General Telephone*, 936 F.2d 435, 443 (9th Cir.1991); *Morongo*, 893 F.2d at 1079.

### 2. *The Merits of NSC and Fairchild's Motion for Leave to File an Amended Counterclaim*

■ NSC and Fairchild seek leave to file an Amended Counterclaim which would include an allegation that Delco Electronics has infringed and induced the infringement of the '735, '984 and '634 patents. The Court DENIES this Motion for the following reasons: First, it is questionable whether the additional claims have any substantive merit. As discussed in Section B.2 of this Order, NSC and Fairchild have failed to come forward with even an iota of evidence suggesting that Delco Electronics ever directly infringed the '634 patent. This not only shows that NSC and Fairchild's claim regarding the '634 patent is utterly without merit, but also raises a serious question regarding whether the remaining allegations against Delco Electronics have any factual basis and whether NSC and Fairchild have presented them in good faith.

Second, NSC and Fairchild's litigation tactics thus far in this case raise a serious question whether their current Motion for Leave to File an Amended Counterclaim was filed in bad faith. The Court has already touched on at least one example of NSC's questionable tactics in Section A.2 of this Order, which points out that (1) prior to the filing of this lawsuit, NSC filed an action in Santa Clara County Superior Court alleging that the tolling agreements between it and Hughes were invalid; (2) one of NSC's central contentions was that the tolling agreements "placed no limitation on how long Hughes could delay bringing suit;" and (3) notwithstanding their earlier argument to the contrary, NSC argued to this Court that Hughes was required to file its Complaint on or before December 1, 1992 in order to enjoy the benefit of the tolling agreements. The Court views this not only as a rather unscrupulous attempt to escape the effect of an agreement which was executed in good faith and supported by consideration, but also as an indication of the overall tenor of NSC and Fairchild's approach to this litigation. The complete absence of evidence to support NSC and Fairchild's original Counterclaim against General Motors reinforces this impression, and strongly suggests that the original counterclaim was filed either in bad faith or without a reasonable prefiling investigation as required under Rule 11 of the Federal Rules of Civil Procedure. *See* Section B of this Order.

Third, it is difficult to believe that NSC and Fairchild failed to join Delco Electronics in their original Counterclaim because they were "unsure of which subsidiaries or affiliates of GM actually manufactured the [allegedly] infringing" semiconductors. Points & Authorities in support of Motion for Leave to File an Amended Counterclaim, at 2. Hughes has presented evidence that (1) Richard Sanquini, NSC's Senior Vice President in charge of business development, wrote a letter to Harry Pearce, General Motors' Vice President and General Counsel, stating that "[NSC] and GM Delco ha[d] been partners for the last 20 years," and that "NSC consider[ed] itself an important partner of GM," Alexander Decl., Exh. D; (2) NSC has been the second largest supplier of semiconductor devices to Delco Electronics for at least the past ten years, Sherman Decl., ¶ 3; (3) NSC supplied over $50 million worth of semiconductor devices to Delco Electronics in the 1993 model year, *id.*; (4) NSC has developed

a sales and technical support team to service the Delco Electronics account, *id.* at ¶ 4; and (5) NSC personnel have visited Delco Electronics' manufacturing sites on numerous occasions, *id.* at ¶ 6.

### 3. *Conclusion*

For the reasons stated above, NSC and Fairchild's Motion to File an Amended Counterclaim is DENIED.

IT IS SO ORDERED.